

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

May 27, 2008

**By Hand and ECF**

Honorable Jed S. Rakoff
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

        Re:    <u>United States v. Damian Brown, et al.</u>
                S2 05 Cr. 538 (JSR)

Dear Judge Rakoff:

        The Government respectfully submits this letter in support of its motion *in limine* regarding several anticipated evidentiary issues that may arise during the trial of defendants Damian Brown, Shawn Peterkin, Franz Golding, and Dwayne Palmer, which is scheduled to begin on June 9, 2008. The Government believes that resolution of the following evidentiary issues will avoid delays during trial:[1]

        (1)    The Government intends to offer evidence of prior marijuana arrests of defendants Brown, Peterkin, and Palmer as direct proof of Count One (conspiracy to distribute marijuana);

        (2)    The Government intends to offer evidence of a prior firearm arrest of Brown, and other evidence of firearms possession by Brown, Peterkin, Palmer, and Golding as direct proof of Count Three (possession, use, and carrying firearms during and in relation to a drug trafficking crime);

        (3)    With regard to Brown's October 13, 2004 marijuana arrest, the Government moves to preclude the defense from eliciting any evidence or making any arguments regarding the outcome of that case to suggest that the charges were subsequently dismissed;

---

      [1]    If the Government becomes aware of additional evidentiary issues that it would be prudent to raise with the Court before trial, we will do so promptly.

        (4)       The Government intends to offer statements of David Reeves, one of the intended victims of the April 16, 2005 shooting charged in this case, to a cooperating witness, regarding the murder of Keino Simpson and made within minutes of Simpson's murder as an excited utterance pursuant to Federal Rule of Evidence 803(2);

        (5)       The Government intends to offer statements that David Reeves made to members of the New York City Police Department immediately following the murder of Keino Simpson as an excited utterance pursuant to Federal Rule of Evidence 803(2).

## Background

Defendants Damian Brown, a/k/a "Bossy," Shawn Peterkin, a/k/a "Shawn James," Franz Golding, a/k/a "Frank," and Dwayne Palmer, a/k/a "Leon," a/k/a "Kay-pas," are charged in a seven-count indictment with (1) conspiring to distribute 100 kilograms and more of marijuana from at least in or about 2004 up to and including in or about 2005, in violation of 21 U.S.C. §846; (2) causing the murder of Keino Simpson on April 16, 2005, through the use of a firearm, during, in relation to, and in furtherance of a conspiracy to distribute 100 kilograms and more of marijuana, in violation of 18 U.S.C. §§ 924(j)(1) and 2; and (3) using, carrying and possessing a firearm during, in relation to, and in furtherance of a conspiracy to distribute 100 kilograms and more of marijuana from at least in or about 2004 up to and including on or about April 16, 2005, in violation of 18 U.S.C. §§ 924(c)(1)(A)(iii) and 2. Defendant Brown is charged separately in Count Four with being an alien in possession of ammunition, in violation of 18 U.S.C. § 922(g)(5)(A). Defendants Golding and Palmer are charged separately in Counts Five and Six, respectively, with being aliens in possession of firearms (Golding, a .40 caliber Tanfoglio handgun; Palmer a .40 caliber Glock handgun), in violation of 18 U.S.C. § 922(g)(5)(A). Finally, defendant Peterkin is charged in Count Seven with being a felon in possession of a firearm (a 9mm Keltec handgun), in violation of 18 U.S.C. § 922(g)(1).

The Government expects the evidence at trial to prove the following. From in or about the early 2000's until April 17, 2005, the defendants conspired to distribute large amounts of marijuana, in Westchester County, the Bronx, and Manhattan. The defendants used commercial mail locations – including Mailboxes, Etc. and UPS stores – to receive packages of marijuana from associates in Arizona. The defendants often employed other individuals, generally women, to apply for and rent the commercial mail boxes and to pick up the packages of marijuana. The defendants then sold the packages of marijuana to other distributors, including several cooperating witnesses, for resale on the streets of the Bronx. The defendants also operated a series of stash houses in the Bronx, New York, including a stash house located in the vicinity of 223rd Street and Boston Road.

The Government expects to demonstrate that Keino Simpson, one of the defendants' workers, robbed Peterkin at Peterkin's apartment in the Bronx in early April 2005. During the gunpoint robbery, Simpson and a cooperating witness ("CW-1"), stole more than 20 pounds of marijuana and approximately $40,000 from Peterkin. In the two weeks following the robbery, the defendants, on the one hand, and Simpson and CW-1, on the other, engaged in a series of shootouts leading up to the defendants' murder of Simpson in the vicinity of Gun Hill Road and Gates Avenue in the early morning of April 16, 2005.

The evidence will show that on the morning of April 16, 2005, David Reeves informed NYPD officers that, earlier that morning, he and Keino Simpson were driving in two separate cars in the vicinity of Gun Hill Road, in the Bronx, and were being chased by a third car, which was a silver Nissan. (Complaint, attached hereto as Exhibit A, ¶ 2a). According to Reeves, there were at least three people in the silver Nissan, and they were firing guns at Reeves's car and Simpson's car during the chase. (Complaint ¶ 2a). In the vicinity of Gun Hill Road and Jerome Avenue, the people in the silver Nissan shot and killed Simpson. (Complaint ¶¶ 2a-2b). At the murder scene, officers recovered ballistic evidence from at least three different firearms, including 9mm and .40 caliber firearms, as well as an assault rifle. (Complaint ¶ 4).

On April 16, 2005, Reeves identified a photograph (from a photo array) of defendant Shawn Peterkin as one of the people who was in the silver Nissan that had chased Reeves and Simpson. (Complaint ¶ 2c). In addition, that morning Reeves identified a photograph (from a photo array) of defendant Damian Brown as another one of the individuals who had been in the car with Peterkin, firing guns at Reeves and Simpson during the car chase. Reeves identified Peterkin and Brown, respectively, by the names "Shawn" and "Bossy."

Officers investigated Peterkin's criminal history, and learned that there was an outstanding warrant for his arrest based on federal immigration violations. (Complaint ¶ 2c). Officers also learned that there was at least one other outstanding warrant for Peterkin's arrest, a bench warrant issued in New York County Criminal Court in the name of "Shawn James," one of Peterkin's aliases.

Separately, on the morning of April 16, 2005, a DEA agent was advised by a registered confidential informant ("the CI") that defendant Shawn Peterkin had murdered Simpson early that morning, and that defendant Damian Brown and another man, Anthony Cunningham, were also involved in the murder. The CI provided the DEA agent with the cellular telephone numbers for Peterkin, Brown, and Cunningham. Later that day, officers obtained a court order establishing a pen register, with "trap and trace" and "cell site location" devices, on the cellular telephone numbers of Peterkin, Brown, and Cunningham. The pen register orders were signed at approximately 8:45 p.m. on April 16, 2005.

In the early morning of April 17, 2005, officers went to the Courtesy Motel, in Fort Lee, New Jersey, based on pen register information showing that Peterkin's cellular phone

had made a call to the motel. (Complaint ¶ 2c). In the parking lot of the Courtesy Motel, near the right rear wing of the motel, officers observed a late-model silver Nissan Maxima, with New York license plate DEZ 6480, which fit Reeves's description of the vehicle that had chased Reeves and Simpson. Officers checked the vehicle's registration, and found that the silver Nissan was registered to "Barbara P. Melvin," at 85 Washington Boulevard, in Mount Vernon, New York, 10550. (Complaint ¶ 2d).

While officers were still conducting surveillance at the Courtesy Motel, other officers entered information from the Nissan's registration into various computer databases. The officers discovered that the Mount Vernon address where the vehicle was registered was associated with a family name of "Ellis." (Complaint ¶ 2d). In particular, the computer checks showed that someone named "Rachel C. Ellis" had lived at – or was at least associated with – 85 Washington Boulevard, in Mount Vernon, for over a decade. The computer checks further revealed that the person listed as "Rachel C. Ellis" was also known – under the same date of birth and social security number – as "Rachel Melvin" and "Rachel C. Peterkin," the name of defendant Shawn Peterkin's wife. Moreover, the person listed as "Rachel C. Ellis"/"Rachel C. Peterkin" was associated with other addresses that were associated with Shawn Peterkin.

Officers then discovered that two rooms at the Courtesy Motel, rooms 106 and 107, had been registered together under the name "Ellis." (Complaint ¶ 2d).[2] Officers spoke with a representative of the motel, who explained that the occupants of rooms 106 and 107 had first checked in on the afternoon of April 15, 2005; that they had paid in cash; and that they had registered both rooms together under the same name, "Christopher Ellis," with an address on "Ruscomb Ave." in Philadelphia. The occupants of rooms 106 and 107 had renewed their registration on the afternoon of April 16, 2005.

Officers then located rooms 106 and 107, which were in the right rear wing of the motel, near where the silver Nissan was parked. In order to execute the federal arrest warrant for Shawn Peterkin, officers entered the two rooms registered under the name "Ellis," each time after first knocking and announcing their presence. (Complaint ¶ 2e). Officers first entered room 107, where they found defendant Dwayne Palmer and a woman. (Complaint ¶ 2e). Palmer was seized and detained, and officers recovered a loaded .40 caliber semi-automatic pistol, which they observed in plain view on the floor of the motel room. (Complaint ¶ 2e). The officers realized that Palmer was not Peterkin, and that Peterkin was not inside room 107. Palmer was arrested for possession of the firearm. (Complaint ¶ 2e).

In a further effort to arrest Shawn Peterkin, the officers then entered room 106, where they found defendant Franz Golding. (Complaint ¶ 2e). Golding was seized and detained,

---

[2] The Complaint incorrectly states that the two rooms were "107 and 108" (Complaint ¶ 2d), but the correct numbers were 106 and 107.

and officers recovered another loaded .40 caliber semi-automatic pistol, which they observed in plain view on the floor of Golding's motel room. (Complaint ¶ 2e). Golding was arrested for possession of the firearm. (Complaint ¶ 2e).

At that point, officers at the Courtesy Motel consulted with other officers who were monitoring the pen register on Shawn Peterkin's cellular phone, and learned that Peterkin's phone was still active in the vicinity of the motel. Accordingly, officers at the motel began to go from room to room – accompanied by a motel manager – knocking on doors in the vicinity of rooms 106 and 107 in their search for Peterkin. (Complaint ¶ 2f). When officers knocked on the door to room 98, Peterkin answered the door, and was arrested. (Complaint ¶ 2f). Incident to Peterkin's arrest, officers conducted a protective sweep of his motel room. During the sweep, officers located Peterkin's female companion, and recovered a loaded 9mm semi-automatic pistol in plain view in the bathroom.

Following his arrest, defendant Franz Golding was interviewed by NYPD officers at the Bronx Homicide Taskforce offices, on Simpson Street, in the Bronx. The interview took place in the early morning of April 18, 2005, after the arrest processing of all of the defendants. The officers advised Golding of his Miranda rights by way of a written waiver form. Golding initialed each of the statement of rights, and signed the form. Golding thereafter made a statement to the officers describing his role in the murder of Simpson, which he signed.

On April 28, 2005, defendant Damian Brown was arrested in Newark, New Jersey. Following his arrest, Brown was interviewed by NYPD officers at the Bronx Homicide Taskforce offices. The officers advised Brown of his Miranda rights by way of a written waiver form. Brown initialed each of the statement of rights, and signed the form. Brown thereafter made a statement to the officers describing his role in the murder of Simpson, which he signed.

Defendants Peterkin, Golding, and Palmer moved to suppress the firearms that were seized from motel rooms in which the defendants were arrested on or about April 17, 2005. In addition, defendant Golding moved to suppress the post-arrest statement he made to officers after having signed a Miranda waiver form. Judge Mukasey held evidentiary hearings on these motions on July 6, 2006; July 20, 2006; and August 1, 2006. On September 8, 2006, Judge Mukasey denied Golding's and Palmer's motions. The case was subsequently transferred to The Honorable Barbara S. Jones. On May 22, 2008, Judge Jones held an evidentiary hearing on Peterkin's remaining suppression motion, which had been held in abeyance pending a competency evaluation of Peterkin. On May 23, 2008, Judge Jones denied Peterkin's motion to suppress the 9mm Keltec handgun found in room 98 at the time of Peterkin's arrest. On the same day, the parties were notified that the case had been transferred to Your Honor.

## Discussion

A. **Evidence of Arrests of Defendants Peterkin, Palmer, and Brown Is Admissible as Direct Evidence of the Marijuana Conspiracy**

The Government seeks to admit evidence of prior marijuana arrests involving defendants Peterkin, Palmer, and Brown through testimony by the arresting officers and through other co-conspirators, in order to prove the marijuana distribution by these defendants both during the life of the conspiracy and as background to the conspiracy. Where appropriate, the Government will establish that the defendants were convicted of these crimes through their guilty plea allocutions and/or certified records of conviction. In connection with several of these arrests, the police seized significant amounts of marijuana and cash from the defendants. These arrests are direct evidence of the at-issue marijuana conspiracy, corroborate testimony by cooperating witnesses about the scope of the marijuana conspiracy and the methods used by the defendants in the charged conspiracy, and further establish the relationships among the co-conspirators. As such, these arrests are admissible. This evidence also is admissible, pursuant to Federal Rule of Evidence 404(b) ("Rule 404(b)"), to prove the defendants' motive, opportunity, intent, preparation, plan, knowledge, identity, and absence of mistake or accident to participate in the charged offenses.

1. <u>Applicable Law</u>

The at-issue evidence is admissible to: (1) complete the story of the crimes charged and fill in the chronology of events that will be described by cooperating witnesses; (2) explain the nature and development of the illegal relationships among the co-conspirators; and (3) explain conduct — such as the use of guns — that is emblematic of violent narcotic organizations like the one controlled by the defendants. *See United States v. Concepcion*, 983 F.2d 369, 392 (2d Cir. 1992) ("An act that is alleged to have been done in furtherance of the alleged conspiracy . . . is not an 'other' act within the meaning of Rule 404(b); rather, it is part of the very act charged."); *United States v. Inserra*, 34 F.3d 83, 89 (2d Cir. 1994) ("evidence of other bad acts may be admitted to provide the jury with the complete story of the crimes charged by demonstrating the context of certain events relevant to the charged offense"); *United States v. Rosa*, 11 F.3d 315, 333-34 (2d Cir. 1993) (evidence of prior acts of car theft and drug dealing properly admitted to show development of illegal relationship between defendant and co-conspirator and to explain how defendant came to play important role in conspiracy); *United States v. Pitre*, 960 F.2d 1112, 1119 (2d Cir. 1992) (evidence of prior narcotics transactions admissible as relevant background information to explain relationship among alleged co-conspirators); *United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990) (evidence of pre-existing drug trafficking relationship between defendant and co-conspirator admissible to aid jury's understanding of how transaction for which defendant was charged came about and his role in it); *see also United States v. Langford*, 990 F.2d 65, 70 (2d Cir. 1993) ("evidence of acts committed prior to the time charged in the indictment [admissible] to prove the existence of the

alleged conspiracy"). Evidence of other acts may be admitted to provide the jury with the complete story of the crime charged by demonstrating the context of certain events relevant to the charged offense. *See Inserra*, 34 F.3d at 89. Evidence of uncharged criminal activity is not considered "other crimes" evidence under Rule 404(b) "if it arose out of the same transaction or series of transactions as the charged offense, or if it [is] inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime [on] trial." *United States v. Towne*, 870 F.2d 880, 886 (2d Cir. 1989) (citations omitted) (alterations in original).

Further, evidence of prior acts is admissible under Rules 404(b) and 403 of the Federal Rules of Evidence if it is (1) advanced for a proper purpose; (2) relevant to the crimes for which the defendant is on trial; (3) more probative than prejudicial; and (4) if requested, admitted subject to a limiting instruction. *See United States v. Zackson*, 12 F.3d 1178, 1182 (2d Cir. 1993); *United States v. Ramirez*, 894 F.2d 565, 568 (2d Cir. 1990) (citing *Huddleston v. United States*, 485 U.S. 681, 691-92 (1988)). Under the Second Circuit's "inclusionary approach" to the admission of other act evidence, evidence of prior crimes, wrongs or acts is admissible for any purpose other than to show a defendant's criminal propensity. *United States v. Pascarella*, 84 F.3d 61, 69 (2d Cir. 1996).[3]

2. The November 21, 2003 Arrest of Shawn Peterkin

On or about November 21, 2003, using the name "Shawn James," Peterkin was arrested with a female co-conspirator ("CC-1"), after a worker at a UPS store called the NYPD to report the delivery of several packages containing marijuana to the UPS store located at 208 E. 51st Street in Manhattan. Peterkin and CC-1 were arrested after picking up two packages containing approximately eight pounds of marijuana from the UPS store. The two UPS packages containing marijuana had been sent from Tucson, Arizona. Upon his arrest, Peterkin possessed $1200.00 in small bills as well as keys to another commercial mailbox located in a different part of Manhattan. Peterkin was arrested along with CC-1, which is consistent with expected testimony by cooperating witnesses that the members of the conspiracy often used other individuals, usually women, to pick up packages of marijuana during the course of the conspiracy. In addition, as set forth in more detail below, Peterkin's co-conspirator, Dwayne Palmer, was arrested in Yonkers in 2002, retrieving packages of marijuana addressed to CC-1 at in a UPS store mailbox rented by CC-1. Furthermore, Peterkin's arrest on November 21, 2003 is at or around the time period charged in the Indictment. (Count One alleges that the conspiracy began "[f]rom at least in or about 2004.") This evidence, then, is directly relevant to the existence of the marijuana conspiracy at issue in this case.

---

[3] The Court has wide latitude in determining whether to admit this kind of "other act" evidence. The Second Circuit reviews the decision on an abuse of discretion standard. *Pascarella*, 84 F.3d at 69; *Langford*, 990 F.2d at 70.

3.  The October 13, 2004 Arrest of Damian Brown

On or about October 13, 2004, Brown was arrested with another marijuana dealer during the execution of a search warrant at 1058 Duncan Street in the Bronx, New York. The NYPD recovered two scales and a small amount of marijuana from Brown's bedroom. The NYPD also recovered two large bags of marijuana in the kitchen of the apartment containing approximately two pounds of marijuana. During the arrest, Brown told the NYPD officers that he had lived at 1058 Duncan Street for approximately three months. Brown's complaint was ultimately dismissed by the Bronx District Attorney's Office. Brown's possession of scales used to weigh marijuana is, nevertheless, directly relevant to the existence of the marijuana conspiracy at issue in this case. Brown's possession of drug scales during the charged conspiracy is highly probative of his involvement in selling marijuana to other distributors, and will corroborate the testimony of co-conspirators who will testify that Brown handled deliveries of marijuana in furtherance of the charged conspiracy.

4.  Arrests of Dwayne Palmer

    a.  April 30, 2002 Arrest

On April 30, 2002, Dwayne Palmer, using the name "Arthur Lewis," was arrested and charged in Yonkers, New York, with possession of marijuana. On that date, Yonkers police officers effected a controlled delivery of two packages, each containing approximately two pounds of marijuana, to Palmer, at a Mailboxes, Etc. store on McLean Avenue in Yonkers, New York, where CC-1 had rented mailbox number 314. Employees of the store had previously notified Yonkers police officers as to suspicious activity related to the mailbox rented by CC-1, and the officers used a canine to detect the presence of narcotics in the boxes. Subsequently, the officers obtained a search warrant for the boxes, and they discovered that both packages, which were addressed to CC-1, contained approximately two pounds of marijuana. After Palmer arrived at the store and retrieved the two boxes, he was arrested, and Yonkers police officers obtained a search warrant for Palmer's car. Pursuant to the execution of that search warrant, police officers found numerous documents related to Palmer's rental of other mailboxes at different locations, including the following: (i) a mailbox rental agreement in the name of "Arthur Lewis" for a contract to begin on April 1, 2002, for box number 346 at a Mailboxes, Etc. store located at 350 Third Avenue in New York, New York; (ii) an application in the name of "Arthur Lewis," dated February 21, 2002, to rent box number 323 at a Mailboxes, Etc. store located on Amsterdam Avenue in New York, New York; (iii) a receipt in the name of CC-1, for the rental of box number 795 at dp Communications, in New Rochelle, New York, from May 1, 2002 until August 1, 2002; and (iv) a receipt for payment of a mailbox service to a Mailboxes, Etc. store located at 1636 Third Avenue in New York, dated January 31, 2002, and a business card for that store containing the handwritten notation "#303."

Palmer subsequently pled guilty to criminal possession of marijuana in the third degree in New York State Court, for which he was sentenced to a term of six months' imprisonment.

The evidence of marijuana trafficking by Palmer in April 2002 in Yonkers is direct evidence of the marijuana conspiracy charged in Count One. Palmer's conduct in April 2002 shows a criminal partnership with CC-1, who rented the mailbox at the UPS store in Yonkers to which the packages of marijuana were shipped and to whom the marijuana packages were addressed. Other documents found in Palmer's car indicate that CC-1 participated in renting other mailboxes for Palmer. CC-1 is the same individual who was arrested with Palmer's co-conspirator Shawn Peterkin in November 2003, when she was picking up packages of marijuana for Peterkin at a UPS store in Manhattan. The Government expects to introduce further testimony, by CW-1, that the defendants obtained supplies of marijuana through the mail, that they rented mailboxes at commercial mail drop locations to receive marijuana, and that they typically used other individuals, often women, to retrieve the packages of marijuana. Although Palmer's arrest in Yonkers is approximately eighteen months before the dates of the conspiracy charged in the Indictment, because the Indictment only alleges that the marijuana conspiracy charged in Count One began "at least in or about 2004," the Government submits that Palmer's April 2002 conduct falls within the charged conspiracy. Moreover, the connection linking the April 2002 conduct to the charged conspiracy is even stronger, because the April 2002 conduct involves a common co-conspirator (CC-1) as well as a substantial similarity in methods and means to the charged conspiracy, such that the Government submits that the April 2002 conduct is direct evidence of the charged conspiracy.

In the event that the Court does not find that the April 2002 conduct is direct evidence of the conspiracy charged in Count One, then the Government argues, in the alternative, that the April 2002 conduct is admissible as relevant background to the scope of the charged marijuana conspiracy. In particular, Palmer's 2002 conduct demonstrates Palmer's relationship and criminal partnership with CC-1, who played the same role – picking up packages of marijuana from commercial mail drop locations – in the charged marijuana conspiracy, as well as Palmer's employment of similar methods and means in April 2002 as to the charged conspiracy.

    b.  <u>May 4, 2000 Arrest</u>

On or about May 4, 2000, Palmer, using the name "Vance Barnaby," was arrested and charged with possession of marijuana and possession of marijuana with intent to distribute in Gwinnett County, Georgia. Prior to that date, law enforcement officers in California had intercepted a package containing more than eleven pounds of marijuana which was bound for Georgia. A law enforcement officer, posing as a UPS delivery person, effected a controlled delivery of the package to Palmer at a house in Gwinnett County, Georgia. Palmer pleaded guilty to the charges and was sentenced to seven years' probation.

The evidence of marijuana trafficking by Palmer in 2000 is critical background that explains the formation of the conspiracy. This evidence also shows how and where Palmer learned the skills necessary to operate a narcotics organization. Though Palmer's 2000 conduct is somewhat more removed in time from the other arrests the Government seeks to admit as direct evidence of the charged conspiracy, the Government believes that the strong similarity of the circumstances surrounding Palmer's May 4, 2000 arrest with that of the *modus operandi* of the charged conspiracy makes this arrest admissible as proof of Palmer's motive, opportunity, intent, preparation, plan, knowledge, identity, and absence of mistake or accident to participate in the charged offenses. Palmer's May 4, 2000 conduct is strikingly similar to the *modus operandi* used by both Palmer and his co-conspirators during the charged conspiracy. During the charged conspiracy, the defendants, as Palmer did in May 2000, (1) used fake names (2) to receive packages containing marijuana, (3) via a commercial carrier, (4) with each package containing several pounds of marijuana. The Second Circuit has upheld evidence with similar *modus operandi* to establish a defendant's participation in a charged crime. *See*, *e.g.*, *United States v. Mills*, 895 F.2d 897, 907 (2d Cir. 1990) ("Rule 404(b) permits evidence of similar acts to prove a 'signature crime,' *i.e.*, a *modus operandi* where the crimes are 'so nearly identical in method as to ear-mark them as the handiwork of the accused'") (quoting 2 J. Weinstein & M. Berger, *Weinsten's Evidence* ¶ 404[16], at 404-127 (1985)); *United States v. Tubol*, 191 F.3d 88, 95 (2d Cir. 1999) ("We have allowed proof of prior bad acts to show identity where the defendant used very similar methods in the charged crime and the prior bad act.").

        4.        <u>The Proffered Evidence Should Not Be Excluded Under Rule 403</u>

The proffered evidence is highly relevant and probative of the marijuana conspiracy charged in the Indictment, and there is no basis to exclude it under Rule 403. The defendants will not be unfairly prejudiced by the admission of the proffered evidence.

The proffered evidence is probative of the defendants' activities with regard to the offenses charged in the Indictment, and to the defendants' involvement in the marijuana conspiracy. The proof is inextricably intertwined with the defendants' participation in the charged conspiracy. Given the fact that these and similar acts were part of the defendants' participation in the charged offenses, it cannot be said that admission of the evidence would cause any unfair prejudice, let alone unfair prejudice that substantially outweighs the probative value of the evidence. *See* Fed. R. Evid. 403.

Further, since similar acts are charged in the Indictment, the proffered evidence is not more sensational than any other evidence of the charged crimes. There is, therefore, no danger that the admission of this evidence would elicit an emotional response from the jury. *See United States v. Pitre*, 960 F.2d 1112, 1120 (2d Cir. 1992) (in narcotics case, evidence of prior narcotics transactions admitted where other acts evidence "'did not involve conduct any more sensational or disturbing than the crimes with which [the appellants were] charged'") (quoting *United States v. Roldan-Zapata*, 916 F.2d at 804). The proffered evidence, therefore, should be

admitted.

      **B.**    **Evidence of Gun Possession By Defendants Peterkin, Palmer, and Brown and Brown's March 5, 2005 Gun Arrest Is Admissible as Direct Evidence of the <u>Narcotics Conspiracy and The Firearms Violations</u>**

      The Government seeks to admit evidence of prior gun possession by defendants Peterkin, Palmer, Golding, and Brown through testimony by cooperating witnesses in order to prove the narcotics distribution and weapons possession offenses with which the defendants are charged. The Government also seeks to admit evidence of defendant Brown's March 5, 2005 arrest and subsequent conviction for possessing a loaded Ruger 9mm handgun in a car registered to Rachel Peterkin, defendant Shawn Peterkin's wife. The Government will establish that Brown was convicted of this crime through his guilty plea allocution and certified record of conviction.

      1.    <u>Applicable Law</u>

      Proof of the defendants' use and possession of firearms is admissible as direct proof of Count Three of the Indictment, which charges each defendant with using, carrying, and possessing a firearm during, in relation to, and in furtherance of the charged marijuana conspiracy from at least in or about 2004 up to and including on or about April 16, 2005. As such, evidence of the defendants' possession and use of guns, during the time period charged in Count Three, is admissible to prove Count Three.

      Evidence of the defendants' use of guns is further admissible as direct proof of the narcotics conspiracy charged in Count One of the Indictment. It is well established in this Circuit that firearms are admissible in narcotics cases as "tools of the trade." *See*, *e.g.*, *United States v. Becerra*, 97 F.3d 669, 671 (2d Cir. 1996) (noting that the Second Circuit has "repeatedly approved" admission of firearms in drug cases because guns are "tools of the trade"); *United States v. Vegas*, 27 F.3d 773, 778-79 (2d Cir. 1994); *see also United States v. Torres*, 901 F.2d 205, 235 (2d Cir. 1990) (firearms properly admitted against all defendants at narcotics trial, including defendants not charged with use and carrying of guns under 18 U.S.C. § 924(c)). Such firearms are not proof of uncharged crimes subject to Federal Rule of Evidence 404(b) ("Rule 404(b)"), but are admitted as direct evidence of the narcotics conspiracy charged in the indictment. *See United States v. Concepcion*, 983 F.2d 369, 392 (2d Cir. 1992) ("An act that is alleged to have been done in furtherance of the alleged conspiracy . . . is not an 'other' act within the meaning of Rule 404(b); rather, it is part of the very act charged."); *United States v. Viserto*, 596 F.2d 531, 537 (2d Cir. 1979) (admission by a cooperating witness that he received guns from the defendant was proper because the testimony "was significant . . . in linking [the defendant] to the [narcotics] conspiracy and showing its scope"); *cf. United States v. Gotti*, 2004 WL 2389755, at *5-6 (Oct. 26, 2004) (Casey, J.) (holding that evidence of an uncharged murder was not subject to strictures of Rule 404(b) because the uncharged murder was inextricably linked to the charged conspiracy). The rationale for admitting such evidence is that "substantial

dealers in narcotics keep firearms on their premises as tools of the trade almost to the same extent as they keep scales, glassine bags, cutting equipment and other narcotics equipment." *United States v. Weiner*, 534 F.2d 15, 18 (2d Cir. 1976). The Second Circuit has even "taken judicial notice that, to substantial dealers in narcotics, firearms are as much tools of the trade as are the commonly recognized articles of narcotics paraphernalia." *United States v. Crespo*, 834 F.2d 267, 271 (2d Cir. 1987).

In *United States v. Casamento*, 887 F.2d 1141 (2d Cir. 1989), the Second Circuit affirmed the admission of an Uzi and several handguns recovered from one of the defendant's businesses. The Circuit found that, "[a]lthough the Government did not allege that the defendants used these guns, *the guns themselves, in context, were probative of the existence of the narcotics conspiracy charged.*" *Id.* at 1155-56 (emphasis added). Likewise, the Second Circuit has repeatedly upheld the admission of evidence of firearms found at stash locations as evidence of a narcotics conspiracy. *See, e.g., United States v. Weiner*, 534 F.2d 15, 17-18 (2d Cir. 1976); *United States v. Fernandez*, 829 F.2d 363, 367 (2d Cir. 1987). In so doing, the Circuit has rejected the defendant's claim here that the prejudicial impact of such firearms outweighs their probative value. *See Fernandez*, 829 F.2d at 367; *Weiner*, 534 F.2d at 18.

In *Fernandez,* the Second Circuit upheld the admission of a weapon found in the apartment of a co-conspirator who was not on trial. The Court explained:

> Even if the fully loaded gun did not belong to [the defendant], it did belong to a named co-conspirator and it was seized from the scene of a drug transaction. The gun was thus highly probative of the existence of a narcotics conspiracy. Where a loaded gun has been seized from an apartment that was "the focal point of the [narcotics] conspiracy," the Second Circuit has held that such evidence has significant probative value.

829 F.2d at 367 (citations omitted).

        2.      <u>Evidence of the Defendants' Possession and Use of Guns</u>

The Government intends to elicit the following evidence at trial:

        a.      <u>Peterkin's and Brown's Purchase of a Firearm from Co-Conspirators</u>

Two cooperating witnesses ("CW-2" and "CW-3"), each of whom were engaged in a conspiracy to distribute marijuana and who were supplied with marijuana by Peterkin and the other defendants, will testify that their co-conspirator ("CC-2"), who also was supplied with marijuana by Peterkin and the other defendants, sold a gun to Peterkin and Brown in or about the fall of 2004. In particular, CW-2 and CW-3 will testify that CC-2 sold Peterkin and Brown the .40 caliber Tanfoglio handgun that was recovered on Golding at the time of his arrest in April

2005. Peterkin and Brown attempted to purchase the gun from CC-2 in exchange for marijuana, but CC-2 ultimately sold the firearm to Peterkin and Brown for approximately $500.

        b.        Peterkin's and Golding's Possession and Use of Guns Outside the National Black Theatre in early April 2005

The Government expects to elicit testimony that several days after Simpson's robbery of Peterkin, the defendants encountered Simpson and CW-1 outside of the National Black Theatre in Harlem. The Government expects CW-1 to testify that Peterkin, Golding, and Brown approached Simpson and CW-1 in Peterkin's silver Nissan Maxima. As they approached, Peterkin initially pointed a handgun at Simpson and pulled the trigger. When Peterkin's handgun did not fire, CW-1 will testify that Golding fired a small automatic gun, likely an Intratec TEC-9, at Simpson.

        c.        Palmer's Possession of a Handgun on April 15, 2005

The Government expects to elicit testimony that on the afternoon of April 15, 2005, CW-1 engaged in a shootout with Peterkin and Palmer. After CW-1 fired shots at Peterkin, CW-1 observed Palmer standing in the street holding what appeared to be a handgun aimed at CW-1. The Government also intends to prove this shootout through 911 calls.

        d.        Brown's March 6, 2005 Arrest

On the evening of March 6, 2005, Brown was arrested at the corner of Baychester Avenue and 233rd Street in the Bronx after NYPD officers observed Brown drive through a stop sign, driving with excessively tinted windows, and driving without a valid license. Upon his arrest, the NYPD found a loaded 9mm Ruger semi-automatic handgun in the 1999 gray Volkswagen sedan in which Brown was driving. The Volkswagen was registered to Rachel Peterkin, the wife of defendant Shawn Peterkin. The NYPD contacted Ms. Peterkin, who picked up the Volkswagen from the arresting officer. Brown pleaded guilty to attempted criminal possession of a weapon in the third degree in New York Supreme Court, Bronx County, on April 20, 2005. It is self-evident that Brown's arrest and conviction in this case is directly relevant to the Government's proof on Count Three -- his use, carrying, and possession of a firearm during and in relation to the marijuana conspiracy. The fact that Brown is arrested in a car registered to Peterkin's wife is further evidence of the relationship among the members of the narcotics conspiracy. Finally, Brown's arrest took place in the vicinity of one of the stash houses the defendants operated in 2005.

These confrontations are direct evidence of the existence and violent nature of the defendants' narcotics conspiracy, and, in particular, provide background evidence regarding the drug-related war that erupted between the defendants and Simpson. In addition, the confrontations demonstrate the defendants' willingness to use firearms and deadly force to

protect their drug business and its members from those who challenged the defendants. Likewise, Brown's possession of a gun during the period charged in Count Three is direct evidence of both the narcotics conspiracy and of Brown's guilt on Count Three of the Indictment.

Finally, this evidence is also admissible, pursuant to Rule 404(b), to prove the defendant's motive, opportunity, intent, preparation, plan, knowledge and absence of mistake or accident to participate in the charged offenses. Under Rule 404(b), evidence of the defendants' possession of guns prior to the murder of Keino Simpson demonstrates that the defendants had the access and wherewithal to obtain guns. The defendants' access and wherewithal to obtain guns is highly probative of the defendants' use of a gun to murder Keino Simpson. Evidence regarding the defendants' prior gun possession is therefore advanced for a proper purpose.

> **C.** **Brown Should Be Precluded from Introducing Evidence or Otherwise Eliciting or Referring to the Outcome of His October 13, 2004 Arrest, in which Charges Were Dismissed**

The Government also moves to preclude defendant Brown from eliciting evidence or otherwise putting before the jury the outcome of his October 13, 2004 arrest, for which the charges were dismissed. The rationale for this motion is simple: the fact of dismissal is evidence of nothing and could have resulted from any number of reasons; at the same time, admission of such evidence would be prejudicial to the Government and likely to mislead and confuse the jury. The Government believes that a limiting instruction advising the jury that the evidence of the arrests are admissible not because of the arrests themselves, but because of the facts and circumstances surrounding those arrests is warranted.

It is well-established that an acquittal or dismissal does not establish that a defendant was innocent of the charged offenses. Instead, an acquittal or dismissal simply means that the prosecutors failed to meet their burden of proving his guilt beyond a reasonable doubt. *See United States v. Marrero-Ortiz*, 160 F.3d 768, 775 (1st Cir. 1998) (acquittal does not establish that defendant is not guilty); *Prince v. Lockhart*, 971 F.2d 118, 122 (8th Cir. 1992) ("[J]udgments of acquittal are not generally relevant . . . because they do not prove innocence; they simply show that the government did not meet its burden of proving guilt beyond a reasonable doubt."); *United States v. Kerley*, 643 F.2d 299, 300-01 (5th Cir. 1981) ("[E]vidence of a prior acquittal [in state court arising from same incident] is not relevant because it does not prove innocence but rather merely indicates that the prior prosecution failed to meet its burden of proving beyond a reasonable doubt at least one element of the crime."). Such evidence also is hearsay, and not admissible under any exception to the hearsay rules. Rule 803(22) exempts judgments of *conviction* from the hearsay rules, but does not allow for the introduction of acquittals.

Because of the dubious evidentiary value of prior acquittals and the lack of

foundation for their admissibility, courts have excluded such evidence. In *United States v. Viserto*, 596 F.2d 531, 536-37 (2d Cir. 1979), the Second Circuit succinctly explained why such evidence is inadmissible:

> A judgment of acquittal is relevant to the legal question of whether the prosecution is barred by the constitutional doctrine of double jeopardy or collateral estoppel. But ***once it is determined that these pleas in bar have been rejected, a judgment of acquittal is not usually admissible to rebut inferences that may be drawn from the evidence that was admitted***. Not only does the inference appellants suggest not flow from the judgment of acquittal . . . , but also a judgment of acquittal is hearsay. The Federal Rules of Evidence except from the operation of the hearsay rule only judgments of conviction, Rule 803(22), not judgments of acquittal.

*Id.* (emphasis added).

In light of this clear precedent, the Court should preclude Brown from eliciting any evidence or otherwise putting before the jury the outcome of his October 13, 2004 arrest.

### D. Statements By David Reeves Immediately Following Simpson's Murder Are Admissible As Excited Utterances

The Government seeks to admit two separate statements of David Reeves, a witness to the murder of Keino Simpson, during trial. The Government first seeks to admit statements Reeves made to a cooperating witness ("CW-1") over the telephone immediately after Simpson was killed in which Reeves identifies Simpson's killers as "Shawn," "Bossy," and "Skinny Man," whom CW-1 knows as defendants Peterkin, Brown, and Golding, respectively. The Government expects the evidence to demonstrate that Reeves, who had just witnessed Simpson's murder from Gun Hill Road after the defendants had shot his car's tires out and fired upon him, was hysterical during the telephone call with CW-1. Reeves's statement to CW-1 satisfies the requirements of Federal Rule of Evidence 803(2) and therefore should be admitted.

The Government also seeks to elicit statements Reeves made to NYPD officers immediately after Simpson's murder regarding the involvement of "Shawn," "Bossy," and "Skinny Man." The Government anticipates that an NYPD officer will testify that in the minutes following Simpson's murder, Reeves informed the NYPD officer that "Shawn," "Bossy," and "Skinny Man" were the shooters. Because the evidence will establish that Reeves was still under the excitement of the shooting at him and the murder of Simpson at the time these statements were made, and the statements related to the murder of Simpson, these statements are also

admissible pursuant to Federal Rule of Evidence 803(2).[4]

1. Applicable Law

Under Rule 803(2) of the Federal Rules of Evidence, the normal bar on hearsay testimony does not apply to "a statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Excited utterances are admissible because such statements are made "under circumstances that eliminate the possibility of fabrication, coaching, or confabulation, and . . . therefore the circumstances surrounding the making of the statement provide sufficient assurance that the statement is trustworthy and . . . cross-examination would be superfluous." *Idaho* v. *Wright*, 497 U.S. 805, 820 (1990). In other words, "the excitement of the event limits the declarant's capacity to fabricate a statement and thereby offers some guarantee of its reliability." *United States* v. *Tocco*, 135 F.3d 116, 127 (2d Cir. 1998).

When a statement is offered as an excited utterance under Rule 803(2), its proponent must demonstrate three things. First, the proponent must establish that a startling event occurred. Second, the proponent must establish that the statement was made while the declarant was under the stress of excitement caused by the startling event. Third, the proponent must establish that the declarant's statement relates to the startling event. *United States* v. *Brown*, 254 F.3d 454, 458 (2d Cir. 2001).

2. Reeves's Statements to CW-1 Regarding Simpson's Murder

Here, the statement of Reeves to CW-1 about the circumstances of Simpson's murder is admissible as an excited utterance. The statement meets all three of the requirements of Rule 803(2). *See United States* v. *Brown*, 254 F.3d at 458. A startling event certainly occurred, comprised of the shooting at both Reeves and Simpson and the murder of Simpson. The statement was made when Reeves was under the stress of the excitement caused by the startling event. Indeed, at the time of the statement – just minutes after the murder – Reeves was hysterical. Finally, the statement relates to the startling event because it consisted of a description of the circumstances of Simpson's murder. Accordingly, the statement constitutes an excited utterance and should be admitted pursuant to Rule 803(2).

---

[4]Although Reeves's availability is immaterial under Rule 803(2), the Government hereby informs the Court and the parties that, after the Simpson murder, Reeves was killed in an apparently unrelated incident, and is therefore not available to testify at trial.

       3.      <u>Reeves's Statements to the NYPD Regarding Simpson's Murder</u>

As set forth above, it is plain that Reeves's statements to the NYPD regarding Simpson's murder satisfy the requirements of Fed.R.Evid. 803(2): Reeves was under the excitement of the shooting at him and the murder of Simpson and the statement described the circumstances of the Simpson murder. Reeves's statement was also not "testimonial" and thus falls outside the scope of the Supreme Court's Confrontation Clause decisions in *Crawford* v. *Washington,* 541 U.S. 36 (2004), and *Davis* v. *Washington*, 126 S. Ct. 2266 (2006). In *Crawford*, the Supreme Court held for the first time that the Confrontation Clause of the Sixth Amendment creates an absolute bar to the admission of testimonial hearsay against a criminal defendant unless either the hearsay declarant is available for cross-examination at trial or the defense has had a prior opportunity to cross-examine the hearsay declarant. 541 U.S. at 50-53. *Crawford*'s mandate for cross examination extends only to *testimonial* hearsay. Other kinds of out-of-court statements–such as business records and co-conspirator statements–remain admissible against a criminal defendant even where the defendant has no opportunity to cross examine the hearsay declarant. *See id.* at 56.

In announcing a broad rule against the admission of testimonial hearsay without cross-examination, the *Crawford* court expressly declined to provide a "comprehensive" account of which kinds of hearsay qualify as "testimonial." *Id.* at 68. The Court did, however, identify the "core class" of testimonial statements as including a "'solemn declaration or affirmation made for the purpose of establishing or proving some fact,'" as well as "statements taken by police officers in the course of interrogations." *Id.* at 51-52 (quoting 1 N. Webster, An American Dictionary of the English Language (1828)).

Subsequently, in *Davis* v. *Washington*, 126 S. Ct. 2266 (2006), the Supreme Court elaborated on the specific types of "statements taken by police officers in the course of interrogations" that qualified as "testimonial." The Court distinguished between statements made "under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency," which are non-testimonial, and statements made "when circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution," which are testimonial. *Id.* at 2273-74. The Court then identified certain characteristics that determine whether a statement is testimonial or not, including: 1) the timing of the statement relative to the event that it describes; 2) the existence of an emergency at the time the statement is made; 3) "the nature of what was asked and answered" to the extent that it was directed at "resolv[ing] a present emergency," rather than simply learning of past events; and 4) the "level of formality" of the interview. *Id.* at 2276-77.

Applying these criteria, the Court ruled that the statements at issue in *Davis* were not testimonial, while the statements at issue in the companion case, *Hammon* v. *Indiana*, were testimonial. In *Davis*, the witness told a 911 operator that her former boyfriend was attacking her

and asked for emergency assistance. During the 911 call, the witness described the events as they were actually happening. *Id*. at 2270-71. The purpose of that description, moreover, was "to describe current circumstances requiring police assistance," not to establish or prove some past fact. *Id*. at 2276. Accordingly, the Court concluded that those statements did not qualify as testimonial.

In *Hammon*, on the other hand, the witness's statements, like those found to be testimonial in *Crawford*, were part of an investigation into past conduct at a time when "[t]here was no emergency in progress." *Id*. at 2278. Specifically, after police arrived at her house in response to a report of a domestic disturbance, the witness told the police that her husband had physically attacked her and her daughter and prevented her from leaving the house. *Id*. at 2272. At the time of the interview, however, the domestic disturbance was over; "the interrogating officer . . . heard no arguments or crashing and saw no one throw or break anything," and "there was no immediate threat" to the witness. *Id*. at 2278. As a result, "the primary, if not indeed the sole, purpose of the interrogation was to investigate a possible crime." *Id*. In that circumstance, the Court ruled, the statements were testimonial and elicited in violation of the Confrontation Clause. *Id.* The Court was careful to note, however, that *not* all on-the-scene questioning of witnesses is testimonial; on the contrary, the fact that police officers at the scene of a crime "need to know whom they are dealing with in order to assess the situation, the threat to their own safety, and possible danger to the potential victim . . . may *often* mean that 'initial inquiries' produce nontestimonial statements." *Id.* at 2279 (quotation omitted).

Following this reasoning, the Eighth Circuit ruled in *United States* v. *Clemmons*, 461 F.3d 1057 (8th Cir. 2006), that statements by a shooting victim to the police at the scene of the shooting were indeed nontestimonial. In *Clemmons*, the police found the victim lying on the ground "with a pool of blood gathering on his right leg" and "talking on his cell phone in a calm voice." *Id*. at 1058-59. The police asked the victim to end the call, which he did, and then asked him who had shot him. The victim identified the shooter and said that the shooter had also stolen a gun from him. *Id*. at 1059. In the Court's view, the victim's statements, which were later admitted at trial against the shooter after the victim was murdered in a separate incident, were not testimonial because "the primary purpose" of the police officer's questions "was to enable him to assess the situation and to meet the needs of the victim." *Id.* at 1060. Moreover, the officer was concerned that there "could be a party armed" in the vicinity and was trying to "figure out who did this" to the victim. *Id*. Given that "the purpose of the interrogation was to enable police assistance to meet [an] emergency," the statements were "nontestimonial" and "do not implicate [the] right to confrontation." *Id*.

Here, consideration of the relevant criteria similarly compels the conclusion that Reeves's statements were not testimonial. At the time Reeves gave his statement, he had recently been the victim of a shooting in which the other victim had died. Thus, the statement was given during an ongoing emergency. The NYPD officer, who took the statement from Reeves, was confronted with an alarming public safety issue – two individuals had been shot at, one killed, on

a public street – and it was thus critical to the officer to identify the perpetrators to ensure that there would be no further violence.

The questioning of Reeves by the NYPD officer was on-the-scene questioning designed to assess the situation and determine any possible ongoing threat to public safety. Unlike the situation in *Hammon*, where the only person responsible for the domestic dispute – the witness's husband – was subdued and no longer an obvious threat by the time the police arrived on the scene, the police officers investigating the scene of the Simpson murder had no idea why the shooting occurred or who was (or were) responsible. Under the factors set forth in *Davis*, Reeves's response to questions designed to answer those questions was a non-testimonial statement that did not implicate the Confrontation Clause. *See Davis*, 126 S. Ct. at 2276-77.[5] Accordingly, Reeves's excited utterance should be admissible as evidence against the defendants.

          Respectfully submitted,

          MICHAEL J. GARCIA
          United States Attorney


By: _____/s/_____
          Michael Q. English
          Jessica A. Masella
          Assistant United States Attorneys
          (212) 637-2594/2288

cc: All defense counsel (by ECF and U.S. Mail)

---

[5] In *Crawford*, the Supreme Court cast doubt on, but declined to overrule, prior decisions holding that the Sixth Amendment's Confrontation Clause applies even to non-testimonial hearsay. Instead, *Crawford* left standing the existing Confrontation Clause test for non-testimonial hearsay: non-testimonial hearsay may be admitted against a criminal defendant if the out-of-court statement either (a) falls within a "firmly rooted" exception to the hearsay bar, or (b) is otherwise supported by independent indicia of reliability. *Ohio* v. *Roberts*, 448 U.S. 56 (1980). Here, as set forth above, Giles's statement falls within a "firmly rooted" exception to the hearsay bar – the excited utterance exception.