UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -:
DWAYNE PALMER,                    : 11 Civ. 8187 (JSR) (JCF)
                                  : 05 Cr. 0538 (JSR)
            Movant,               :
                                  :           REPORT AND
    - against -                   :           RECOMMENDATION
                                  :
UNITED STATES OF AMERICA          :
                                  :
            Respondent.           :
- - - - - - - - - - - - - - - - - - -:
TO THE HONORABLE JED S. RAKOFF, U.S.D.J.:

    After standing trial with three co-defendants, Dwayne Palmer

was convicted of conspiracy to distribute and possess with intent

to distribute marijuana; using a firearm to commit murder in

furtherance of the conspiracy; using and carrying a firearm during

and in furtherance of the conspiracy; and being an alien in

possession of a firearm. United States v. Brown, 374 F. App'x 208,

209 (2d Cir. 2010). The conviction was affirmed on appeal, id.;

see Palmer v. United States, 131 S. Ct. 313 (2010) (denying

petition for writ of certiorari), and Mr. Palmer now moves pursuant

to 28 U.S.C. § 2255 to vacate, set aside, or correct his sentence.

In his amended motion,[1] Mr. Palmer asserts five grounds for relief:

(1) trial counsel provided ineffective assistance by failing to

argue certain possible defenses during summation; (2) trial counsel

provided ineffective assistance by stipulating to the admissibility

of tapes of certain 911 emergency calls without prior investigation

into the callers and the veracity of their claims; (3) the

---

[1] Mr. Palmer's original motion and amended motion were filed
pro se. I have since appointed counsel to represent him. (Order
dated July 11, 2012).

1

prosecution knowingly elicited perjured testimony from its witness, Omar Ken, and (4) the petitioner is actually innocent of the conspiracy and the murder counts.  For the reasons that follow, I recommend denying the motion.

Background[2]

The Government's theory at trial was that Mr. Palmer[3] and his co-defendants Damian Brown,[4] Franz Golding, and Shawn Peterkin killed Keino Simpson to protect the marijuana business that Mr. Peterkin operated, in part, out of a stash house located at 1335 East 223rd Street near Boston Road in the Bronx.  (Tr. at 114-15, 169-70, 308-22, 692-702, 1566-67; Transcript of Tape 12242, Call #1 dated April 15, 2005 ("1st 911 Tr."), attached as Exh. 6 to Petitioner's Amended 28 U.S.C. § 2255 Motion ("Am. Mot."), at 1; Transcript of Tape 12242, Call #2 dated April 15, 2005 ("2nd 911 Tr."), attached as Exh. 7 to Am. Mot., at 1; Letter of Bruce K. Kaye dated Dec. 3, 2013 ("Kaye Letter") at 4).  A significant portion of the evidence against Mr. Palmer came through Omar Ken, a witness co-operating with the prosecution (Tr. at 937), who, along with Mr. Simpson, also  worked for the business, picking up marijuana from commercial mailbox stores and selling it.  (Tr. at 720-21, 823-26, 832-36).

---

[2] The section relates only evidence and proceedings relevant to Mr. Palmer's claims.

[3] Mr. Palmer is sometimes referred to in the trial transcript by his nickname, "Kaposs."  (Trial Transcript ("Tr.") at 828).

[4] Mr. Brown is sometimes referred to in the trial transcript by his nickname, "Bossy."  (Tr. at 827).

The events relevant to this petition occurred in April 2005, and began with a disagreement between Mr. Simpson and Mr. Peterkin about a missing package of marijuana for which Mr. Peterkin was demanding payment.  (Tr. at 836-37, 941).  Mr. Ken testified that, as a result of the dispute, Mr. Simpson and Mr. Ken decided to rob Mr. Peterkin's home.  (Tr. at 837-38, 941).  Disguised with ski masks and carrying guns, they forced Mr. Peterkin inside his house at gunpoint, restrained him along with his daughter and his wife -- whom Mr. Ken pistol-whipped and threatened -- and stole marijuana and cash from the home.  (Tr. at 838-44; 941-50).

According to the prosecution, this incident precipitated a series of confrontations between Mr. Peterkin and his cohorts Mr. Brown, Mr. Golding, and Mr. Palmer, on the one hand, and Mr. Simpson and Mr. Ken, on the other.  The first occurred the day after the robbery, outside the National Black Theater in Harlem. Mr. Peterkin, who was with Mr. Brown, Mr. Golding, and another man,[5] drove up next to Mr. Simpson's car, which contained Mr. Simpson and Mr. Ken, and tried to fire a gun into the car, but the weapon jammed.  (Tr. at 845; Resp. Memo. at 15-16).  Mr. Golding

---

[5]   The Government contends this man was Mr. Palmer (Government's Memorandum of Law in Opposition to Defendant Dwayne Palmer's Motion to Vacate, Set Aside, or Correct his Sentence Under 28 U.S.C. § 2255 ("Resp. Memo.") at 16), then qualifies this in a footnote, stating, "Palmer was not explicitly identified[;] . . . rather, the fourth man matched Palmer's description (Resp. Memo. at 16 n.6 (citing Tr. at 847)).  The "description" cited comes from Mr. Ken, who testified, "[T]here was another black one in [the car], but I never see his face good."  (Tr. at 847); see also Brown v. United States, Nos. 11 Civ. 7797, 05 Cr. 538, 2013 WL 1395871, at *2 (S.D.N.Y. April 8, 2013) (noting, in opinion denying Mr. Brown's § 2255 petition, that fourth passenger in Mr. Peterkin's car was "unidentified.").

then fired an automatic weapon into the car. (Tr. at 848-49).  As
Mr. Peterkin's car drove off, Mr. Simpson, now out of his car, ran
behind the moving vehicle and may have shot at it.  (Tr. at 849).

Approximately one week later, Mr. Peterkin arranged to meet
Mr. Simpson and Mr. Ken near the stash house.  (Tr. at 850, 853-
55).  Mr. Simpson and Mr. Ken wanted to convince Mr. Peterkin that
they had not robbed him.  (Tr. at 854).  The meeting did not,
apparently, go well, and ended with Mr. Simpson firing a shot into
the air.  (Tr. at 856-57).  Later, Mr. Brown had a phone
conversation with Mr. Simpson and Mr. Ken during which he tried to
persuade them to return what they had stolen from Mr. Peterkin and
agree to a truce.  (Tr. at 857-58).  That conversation ended after
Mr. Golding got on the phone and threatened to shoot Mr. Ken.  (Tr.
at 858-59).

On April 15, 2005, in response to this threat, Mr. Ken
testified that he decided to look for one of the defendants in
order to "shoot [him] up."  (Tr. at 859).  While driving on Boston
Road, he saw Mr. Peterkin, Mr. Golding, and Mr. Palmer walking
towards the stash house.  (Tr. at 860).  Mr. Ken fired "about seven
shots" at Mr. Peterkin and drove off.  (Tr. at 860).  Mr. Palmer
then attempted to shoot at Mr. Ken's escaping car, but the gun
"never went off."  (Tr. at 861).

At trial, a tape of two 911 calls was played pursuant to a
stipulation of admissibility.  (Tr. at 49, 989).  In the first, an
anonymous caller, calling from a building next door to the stash
house, reported seeing people in a car shooting into a parked car

while driving past.  (1st 911 Tr. at 1-3).  Two men got out of one of the cars and shot at the other car.  (1st 911 Tr. at 3).  Asked by the operator to describe the men outside, the caller stated, "[B]lack.  One has a yellow shirt over [unintelligible].  He lives next door, I believe."  (1st 911 Tr. at 3).  She later reported that the one with the yellow shirt had a "bright cap on."  (1st 911 Tr. at 4).  A second anonymous caller, also calling from a building on the same block, reported that three African-American men were running down the street and that one, who was "dark-skin[ned]" and wearing a yellow hat, had a gun.  (2nd 911 Tr. at 2-3).

A few hours later, in the early morning of April 16, Mr. Simpson, Mr. Ken, and David Reeves[6] drove in separate cars from a club in New Rochelle and parked across the street from a restaurant at 219th Street and White Plains Road  (Tr. at 861-64).  Mr. Ken testified that he saw Mr. Peterkin, Mr. Palmer, Mr. Golding, and Mr. Brown drive by in Mr. Peterkin's car, and each open fire at the three parked cars.  (Tr. 866-68).  A high-speed chase ensued, which ended with the defendants shooting at Mr. Simpson's car until it crashed into a parked car near the intersection of Gun Hill Road and Gates Road (Tr. at 114-15, 868-71).  Mr. Simpson died of his wounds.  (Tr. at 114-15, 170).

On the morning of April 17, law enforcement agents arrested Mr. Peterkin, Mr. Golding, and Mr. Palmer in separate rooms at a roadside motel in Fort Lee, New Jersey.  (Tr. at 217, 221-29).

---

[6] Mr. Reeves is sometimes referred to in the trial transcript by his nickname, "Struggle."  (Tr. at 802).

Each room also contained a firearm; the one recovered from Mr. Palmer's room was a .40-caliber Glock semi-automatic handgun. (Tr. at 221-22). The Government's ballistics expert testified that one of the spent shells recovered from the scene of the shooting was "more likely than not" fired from the gun found in Mr. Palmer's room. (Tr. 1531-32). The Government also presented, through a law enforcement official, post-arrest statements made by Mr. Golding and Mr. Brown.[7] (Tr. at 1034-49). Among other things, Mr. Golding stated that he lived at "1335 223rd Street, Bronx, New York." (Tr. at 1042).

At the close of the prosecution's case, Mr. Palmer's lead trial counsel, Andrew G. Patel, moved for dismissal of the first three counts against Mr. Palmer, all of which were dependent on Mr. Palmer having been part of the alleged marijuana conspiracy. (Tr. at 1588-89). He argued that no evidence connected Mr. Palmer with narcotics or indicated that he knew of a narcotics conspiracy or participated in it. (Tr. at 1589). The prosecution contended that Mr. Palmer was implicated in the conspiracy by telephone records showing a series of calls between Mr. Peterkin and Mr. Palmer on April 16, 2005 (Tr. at 1574-75); by Mr. Ken's testimony that Mr. Palmer shot at him outside the stash house; and by the 911 call that suggested that "these guys live next door[,] tying [Mr. Palmer] additionally to that stash house" (Tr. at 1590-91). Mr. Patel then corrected the prosecutor, stating, "The 911 call says

_____

[7] The jury was instructed that these statements could only be considered in connection with the defendant who made them. (Tr. at 1038-39, 1046).

one of the guys lives next-door, not all of them live[] next-door."
(Tr. at 1591).   The trial judge -- the Honorable Jed S. Rakoff,
U.S.D.J. -- noted:

> If . . . [Mr. Palmer] was standing at the door to
> the stash house firing guns at anyone who tried to enter
> -- this is not the evidence in this case -- there might
> be a basis for a subtle inference [that Mr. Palmer knew
> it was a stash house and was protecting it].  But what I
> am hearing is much less than that.
>
> Well, I think this is a very serious motion.  I'm
> going to give the government, over lunch, the chance to
> check the record and see if there is anything further
> they want to bring to my attention in that regard.

(Tr. at 1592).  The prosecution later pointed out evidence that Mr.
Palmer and Mr. Peterkin frequently called each other, including
twice on the morning after the Peterkin robbery, and Mr. Palmer's
discovery, with a gun, at the Courtesy Motel along with Mr.
Peterkin and Mr. Golding.  (Tr. at 1610-13).  Judge Rakoff
ultimately denied the motion, stating that "what the government
presented [], though thin and close, is nevertheless sufficient,
that a reasonable juror taking all inferences favorable to the
government . . . could find that Mr. Palmer knew and was engaged in
furthering a marijuana conspiracy." (Tr. at 1730).  Mr. Palmer was
convicted on all four counts.

At Mr. Palmer's sentencing hearing, Judge Rakoff addressed Mr.
Palmer's renewed motion for acquittal, again denying it:

> Well, this was an important motion and by no means
> one that was without some force. . . .
>
> Without going through all the specifics, a great
> deal of which is set forth in the government's papers, we
> have the fact that there was the defendant's seeming
> defense of the stash house and the chronology here, I
> think, tells a lot of the story.

7

There was no history of violence between the
defendants and the group that they were, in effect,
involved in a contretemps with, the group in which Mr.
Simpson figured prominently, before the home intrusion,
the robbery that set off this chain of events.    There
were previous disagreements but no violence or threat of
violence.    And then it quickly escalated and the phone
records which show 25 calls between Mr. Palmer and Mr.
Peterkin in the month leading up to Simpson's murder and
which were made on a phone that the evidence showed Mr.
Peterkin used to communicate with the other people who
unquestionably were involved with him in the marijuana
conspiracy indicates that within hours of the robbery
Peterkin called Palmer.

The next night there was the violence against
Simpson and his confederate Mr. Ken in front of the
National Black Theater that, according to Ken, involved
Palmer and that in any event included some admittedly
ambiguous evidence regarding a "dark-skinned individual"
who accompanied the other defendants in the seeming
retaliation.

Then, on April 15th, Palmer ran out into the street
and fired at Ken during the confrontation in front of
what had been identified as the stash house on East 223rd
Street.    Ken identified Palmer as the one pointing the
gun at him.    The 911 caller [] noted that the shooter,
therefore Palmer, 'lived next-door' and that would permit
the jury to infer that Palmer lived in the stash house
and that what he was doing was defending the stash house
and that, of course, it was only a few hours later that
the chase giving rise to the murder of Simpson occurred.

There are many other tidbits that the government
points out in their papers and I'm not going to dwell on
each and every one of them. . . .

What I think a reasonable juror could find from the
evidence in this case, taking it as I must most favorably
to the government, is that considering all the evidence
at trial, the drug related nature of the robbery, the
escalating violence over the course of the next two
weeks, the location of many of the events right outside
the stash house and all the other facts, the one of which
is sufficient but all of which point to the fact that the
murder was in retaliation for the robbery and the
furtherance of the marijuana conspiracy and that Mr.
Palmer participated in all of that because he was,
himself, a participant and knowing and willing
participant in the marijuana conspiracy.    So, the motion
is denied.

(Sentencing Transcript ("Sent. Tr.") at 4-7).

Discussion

As noted, Mr. Palmer makes four claims in his petition: that trial counsel was ineffective in two respects (Am. Mot. at 2-11); that the Government knowingly presented perjured testimony from Mr. Ken (Am. Mot. at 11-17); and that he is actually innocent of both the conspiracy count and the murder count (Am. Mot. at 17-22).  The petitioner seeks an evidentiary hearing on the ineffective assistance and actual innocence claims.

A.   Ineffective Assistance of Counsel

1.   Legal Standard

The two part test for ineffective assistance of counsel is set forth in Strickland v. Washington, 466 U.S. 668 (1984), which requires a showing that: (1) "counsel's performance was deficient" in that it fell below a standard of "reasonableness under prevailing professional norms" and (2) "the deficient performance prejudiced the defense" in that the errors "deprive[d] the defendant of a fair trial."[8]  Id. at 687-88.  Under Strickland, "[j]udicial scrutiny of counsel's performance must be highly

_____

[8]  Mr. Palmer suggests that his counsel's failure to investigate the 911 calls constituted a "fail[ure] to subject the prosecution's case to meaningful adversarial testing," United States v. Cronic, 466 U.S. 648, 659 (1984), entitling him to a presumption of prejudice.  (Am. Mot. at 10-11).  However, such a presumption is applicable when "counsel failed to oppose the prosecution throughout the [] proceeding as a whole."  Bell v. Cone, 535 U.S. 685, 697 (2002).  Mr. Palmer admits that his counsel mounted a defense.  (Am. Mot. at 2).  Thus, at most, he contends that his counsel "failed to [oppose the prosecution] at specific points."  Bell, 535 U.S. at 697.  He must, therefore, show prejudice.  Id. at 697-98.

9

deferential." Id. at 689.  Specifically "a court must indulge a 'strong presumption' that counsel's conduct falls within the wide range of reasonable professional assistance because it is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight." Bell, 535 U.S. at 702 (quoting Strickland, 466 U.S. at 689).  When looking at trial counsel's performance, "[a]ctions or omissions by counsel that 'might be considered sound trial strategy' do not constitute ineffective assistance." Henry v. Poole, 409 F.3d 48, 63 (2d Cir. 2005) (quoting Strickland, 466 U.S. at 689) (second set of quotation marks omitted).  The possibility that the prejudice would have produced a different result must be "substantial, not just conceivable." Harrington v. Richter, __ U.S. __, __, 131 S. Ct. 770, 792 (2011).

    2.  Summation

Mr. Palmer contends that his trial counsel provided ineffective assistance when, in his summation, he argued only that the petitioner was not present at the scene of Mr. Simpson's shooting but did not also argue that, assuming he was present, he might have participated in the shooting for some other reason than to support the charged drug conspiracy.  (Am. Mot. at 2-3).  This claim is meritless.

First, defense counsel's decision to emphasize what he perceived to be the strongest defense, even if that decision may have been incorrect, falls within the realm of sound trial strategy and therefore does not support Mr. Palmer's claim of ineffective

assistance.  See Hogan v. Ercole, No. 05 CV 5860, 2011 WL 3882822, at *20 (E.D.N.Y. Sept. 2, 2011) ("If defense counsel made a tactical decision not to employ a certain defense, that decision does not constitute ineffective assistance of counsel." (citing Greiner v. Wells, 417 F.3d 305, 319 (2d Cir. 2005)); Singleton v. Duncan, No. 03 CV 561, 2006 WL 73734, at *14 (E.D.N.Y. Jan. 10, 2006) ("[A] petitioner cannot prevail on a claim of ineffective assistance merely because he disagrees with his counsel's strategy" (citing Jones v. Barnes, 463 U.S. 745, 752 (1983)).  As Mr. Palmer himself admits, the defense advanced was "not an unreasonable stance" as "there existed a hoard of trial evidence to nourish the roots of Petitioner's defense counsel's planted assertion that Petitioner was not present." (Am. Mot. at 2).  Indeed, arguing the alternative and inconsistent defense that Mr. Palmer was present at the shooting of Mr. Simpson would have been a dangerous trial strategy.  See Gssime v. Greiner, Nos. 02 CV 4602, 03 Misc. 0066, 2003 WL 23185772, at *16 (E.D.N.Y. Oct. 29, 2003) (noting that "[c]ourts have recognized the danger" in presenting inconsistent defenses, and collecting cases); Williams v. Walker, No. 92 Civ. 1905, 1993 WL 22128, at *6 (S.D.N.Y. Jan. 26, 1993) ("Although it would not have been impossible for counsel to argue inconsistent and alternative theories to the jury, competent trial counsel know that reasonableness is absolutely mandatory if one hopes to achieve credibility with the jury." (internal quotation marks omitted)).

Second, Mr. Palmer's defense counsel did in fact highlight the paucity of evidence linking Mr. Palmer to the marijuana conspiracy.

11

In particular, the summation pointed out that the witnesses called by the prosecution, including Mr. Ken, said nothing about Mr. Palmer's involvement in a marijuana conspiracy, concluding, "There is no evidence, no evidence of involvement in a marijuana conspiracy. It just isn't there." (Tr. at 1908-10).

Finally, Mr. Palmer cannot show prejudice from the failure to make such an argument. The verdict shows that the jury believed that Mr. Palmer was involved in the marijuana conspiracy. The jury also disbelieved the arguments made by each of Mr. Palmer's co-defendants that the killing of Mr. Simpson was unrelated to that conspiracy. (Tr. at 1902-03, 1933-34, 1942). In these circumstances, Mr. Palmer cannot show that he was prejudiced by his counsel's decision not to present a similar defense.

Based on the record, Mr. Palmer is not entitled to relief on this claim and an evidentiary hearing is unnecessary. See Puglisi v. United States, 586 F.3d 209, 213, 218 (2d Cir. 2009) (affirming district court's denial of § 2255 motion without hearing where movant failed to state a plausible claim for relief). I therefore recommend that this claim be denied.

### 3.   911 Calls

This ineffective assistance of counsel claim, both in Mr. Palmer's amended motion, filed pro se, and the supplemental submission filed by his appointed counsel, focuses on an inference to be made from the 911 calls of April 15, 2005: that the participant with the yellow shirt, bright cap, and gun "live[d] next door" in the stash house. (1st 911 Tr. at 3-4; 2nd 911 Tr. at

2-3).  The submissions can be read to make two somewhat related arguments: (1) that counsel was ineffective for stipulating to the admissibility of the 911 calls and (2) that counsel was ineffective for failing to investigate the circumstances surrounding the 911 calls.[9]  Each of these concerns counsel's investigation, but in different ways.

  a.  <u>Stipulation</u>

The Government contends that "'trial decisions to offer or stipulate to certain evidence . . . are primarily matters of trial strategy and tactics, and thus are virtually unchallengeable absent exceptional grounds for doing so.'" (Resp. Memo. at 38 (alteration in original) (quoting <u>United States v. Cohen</u>, 427 F.3d 164, 170 (2d Cir. 2005)).  This presupposes that the stipulation has been "made after thorough investigation." <u>United States v. Gaskin</u>, 364 F.3d 438, 468 (2d Cir. 2004).  However, "even strategic choices made after less than complete investigation do not amount to ineffective assistance -- so long as the known facts made it reasonable to believe that further investigation was unnecessary." <u>Henry</u>, 409 F.3d at 63.

Mr. Palmer faults his counsel's investigation, arguing that,

---

[9]  In his Amended Motion, Mr. Palmer frames the issue as whether his trial counsel was ineffective for stipulating to the admissibility of the 911 calls without investigating the circumstances surrounding them.  (Am. Mot. at 5-7).  The supplemental submission from counsel focuses on the failure to investigate, mentioning only that the evidence "was curiously received via stipulation." (Kaye Letter at 3).  The Government has addressed the question of the reasonableness of counsel's decision to stipulate, as well as the reasonableness of the investigation. (Resp. Memo. at 37-40; Letter of Jessica A. Masella dated Feb. 3, 2014 ("Masella Letter")).  I therefore do the same.

had counsel sought to interview the (anonymous) 911 callers or others in the neighborhood, he might have found exculpatory evidence, for example, evidence that the callers did not see Mr. Palmer with a gun or that he did not live at the stash house. (Am. Mot. at 7).    The problem with this argument is that such information would not bear on the admissibility of the evidence, which was the only purpose of the stipulation.    As to that question, given the facts he knew, counsel was reasonable to stipulate to the calls' admissibility.    There was no serious question about their authenticity -- indeed, Mr. Palmer admits the recordings are authentic. (Am. Mot. at 6).   On their face, the statements on the recordings appear to fall into the hearsay exceptions for excited utterances and present sense impressions: the callers are narrating their perception of a gunfight as they are observing it.[10]    See Brown v. Keane, 355 F.3d 82, 89 (2d Cir. 2004) ("The present sense impression exception applies [] to reports of what the declarant has actually observed through the senses, not to what the declarant merely conjectures."); id. at 90 (excited utterance exception applies to out-of-court report "in a moment of excitement -- without the opportunity to reflect on the

---

[10]   The Seventh Circuit has recently expressed doubt as to whether "the spontaneity exceptions in the Federal Rules of Evidence" -- that is, the present sense impression and excited utterance exceptions -- "necessarily rest on a sound foundation." United States v. Boyce, 742 F.3d 792, 796 (7th Cir. 2014); see also id. at 799-802 (Posner, J. concurring) (discussing doubts about basis for excited utterance and present sense impression exceptions, asserting they have no basis in psychology). Nevertheless, these exceptions are recognized in the Federal Rules of Evidence and by the Second Circuit.

consequences of one's exclamation" of "events the witness [is] observing" (internal quotation marks omitted)). Even the statement, "He lives next door, I believe," appears to be based on personal knowledge, as the caller indicates that she lived next door to the stash house: she states that she is calling from 1337 E. 223rd Street and asks the 911 dispatcher not to let the police "come to my house." (1st 911 Tr. at 2, 4). Finally, admission of the recordings could not violate the Confrontation Clause because the recordings were not testimonial: "the primary purpose of the interrogation [wa]s to enable police assistance to meet an ongoing emergency." Davis v. Washington, 547 U.S. 813, 822 (2006); see Quinones v. Artus, No. 10 CV 1992, 2013 WL 5502870, at *6 (E.D.N.Y. Sept. 30, 2013) ("The Court has little trouble concluding [that] the caller's statements in the 911 call were not 'testimonial' for Confrontation Clause purposes. The unidentified individual who called 911 did so in response to an ongoing emergency."); United States v. Chen Kuo, No. 10 CR 671, 2011 WL 145471, at *9 (E.D.N.Y. Jan. 18, 2011) ("[S]tatements of 911 callers, made during an ongoing emergency and for the purpose of obtaining police assistance, are nontestimonial . . . .").

Given these facts, it is not necessary to hold an evidentiary hearing to determine that the decision to stipulate to the admissibility of the 911 calls did not constitute ineffective assistance of counsel.

b.  Investigation

The claim that Mr. Palmer's counsel presses is that trial

counsel was ineffective for failing to investigate the circumstances surrounding the 911 calls prior to trial. In support, he submits three affidavits.

Mr. Patel attests that prior to trial he and an investigator traveled to 1337 E. 223rd Street in the Bronx, "intending to identify and interview one or more of the 'unidentified female' callers, but w[ere] unable to determine their identi[ti]es." (Affidavit of Andrew G. Patel dated Nov. 27, 2013 ("Patel Aff."), attached to Kaye Letter, ¶ 16). Mr. Patel "did not personally attempt to interview the owners or residents of [the stash house] in order to determine whether Mr. Palmer in fact lived [there]." (Patel Aff., ¶ 17). He did, however, instruct the investigator "to speak to anyone in the area who might have relevant information. To the best of [Mr. Patel's] recollection, [the investigator] was unable to speak to anyone." (Patel Aff., ¶ 17). In addition, Mr. Palmer submits affidavits from the co-owners of 1335 E. 223rd Street, Orville Vassel and Alexis G. Usher, both of whom assert that Mr. Palmer did not lease the ground floor apartment (the apartment used as the stash house). (Affidavit of Orville Vassel dated Nov. 6, 2013 ("Vassel Aff."), attached as part of Exh. A to Kaye Letter, ¶ 4; Affidavit of Alexis G. Usher dated Nov. 6, 2014 ("Usher Aff."), attached as part of Exh. A to Kaye Letter, ¶ 4). The affidavits also state that neither Mr. Vassel nor Mr. Usher recognize Mr. Palmer as having been "in or around" the building "either before or after April 15, 2005." (Vassel Aff., ¶ 5; Usher Aff., ¶ 5).

The Supreme Court has held that "'strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.  In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.'" Wiggins v. Smith, 539 U.S. 510, 521 (2003) (quoting Strickland, 466 U.S. at 690-91).  But here it is unnecessary to determine whether Mr. Patel's failure to investigate was a reasonable strategic decision, because Mr. Palmer cannot establish prejudice.

First, the fact that Mr. Palmer did not live in the stash house is of limited relevance.  The 911 caller was equivocal about this point and the jury heard testimony that Mr. Golding, not Mr. Palmer, had provided the stash house's address as his own.  (Tr. at 1042).  Moreover, whether Mr. Palmer leased the premises was immaterial to the charges for which he was tried.  More useful for Mr. Palmer would have been testimony that Mr. Vassel and Mr. Usher did not recognize him as having frequented the area.  But the utility of even this evidence is marginal.  The landlords admit that they did not witness the April 15 shooting, and so they cannot speak to whether Mr. Palmer took part.  Thus, their testimony would not have undermined Mr. Ken's eyewitness account that Mr. Palmer attempted to shoot at him outside of the stash house on that date. The jury was entitled to give this evidence great weight.  Cf. Hayes v. Battaglia, 403 F.3d 935, 938 (7th Cir. 2005) ("[I]t is black letter law that testimony of a single eyewitness suffices for

conviction even if 20 bishops testify that the eyewitness is a liar."). To be sure, the Government relied on the notion that Mr. Palmer lived at the stash house to bolster its contention that he was a knowing participant in the drug conspiracy. (Tr. at 1850). But even if that evidence were undercut, there was significant additional evidence that Mr. Palmer knowingly participated in the conspiracy. He was in close contact with Mr. Peterkin after the home invasion robbery that, according to the prosecution, set into motion the ensuing violence. In addition to being seen attempting to fire on Mr. Ken outside the stash house, Mr. Palmer was seen participating in the April 16 shootout that ended in Mr. Simpson's death. He was arrested, with two co-conspirators, soon afterwards in a New Jersey motel, and the gun found in his room was, more likely than not, fired during the April 16 melee. Finally, the credibility of these witnesses could be open to attack since they would have to acknowledge that they rented property to a tenant who used it to store narcotics. Although it is "conceivable" that the testimony of Mr. Vassel and Mr. Usher would have changed a juror's mind regarding Mr. Palmer's participation in the conspiracy, that possibility is not "substantial." Harrington, __ U.S. at __, 131 S. Ct. at 792.

Nor is there a substantial possibility that Judge Rakoff would have ruled differently on Mr. Palmer's motion for judgment of acquittal. In deciding such a motion, the court must view the evidence "in a light that is most favorable to the government, and with all reasonable inferences resolved in favor of the

government." United States v. Persico, 645 F.3d 85, 104 (2d Cir. 2011) (internal quotation marks omitted).   In his ruling on the motion at the sentencing hearing, Judge Rakoff noted both that "[a] defendant's knowing and willing participation in a conspiracy may be inferred from, for example, her presence at critical stages of the conspiracy that could not be explained by happenstance," United States v. Aleskerova, 300 F.3d 286, 293 (2d Cir. 2002); (Sent. Tr. at 6), and that "[t]o be convicted as a member of a conspiracy, a defendant need not know every objective of the conspiracy[,] every detail of its operation or means employed to achieve the agreed-upon criminal objective, or even the identity of every co-conspirator, United States v. Gleason, 616 F.2d 2, 16 (2d Cir. 1979) (internal citations omitted); (Sent. Tr. at 6).   Here, Mr. Palmer was present, with co-conspirators, for at least three "critical stages" of the conspiracy: the April 15 shooting, the April 16 shooting, and the subsequent arrest in New Jersey. Indeed, taking the evidence in the light most favorable to the Government, Mr. Palmer was also implicated in the National Black Theater incident.   Importantly, testimony or other evidence that Mr. Palmer did not live at the stash house does not undermine this conclusion.   Given these circumstances, a more complete investigation by counsel would have been unlikely to change the outcome of the motion.

    B.   Other Claims

        1.   Allegedly Perjured Testimony

Mr. Palmer claims that Mr. Ken perjured himself when he

testified that (1) Mr. Palmer attempted to fire a gun during the incident outside the stash house on April 15 and (2) Mr. Palmer was in Mr. Peterkin's car along with his co-defendants when they shot at Mr. Ken, Mr. Simpson, and Mr. Reeves in front of the restaurant at 219th Street and White Plains Road on the morning of April 16. (Am. Mot. at 11).  The argument that this testimony is perjured, and that the Government knew it was perjured, rests on contentions that (1) in his pretrial proffers to Special Agent Eric Baldus of the Drug Enforcement Agency, Mr. Ken neither identified Mr. Palmer nor asserted that Mr. Palmer had a gun in connection with the April 15 incident; (2) in his grand jury testimony, Special Agent Baldus similarly did not mention Mr. Palmer's attempt to fire shots during that incident; and (3) the Government asked Mr. Ken a leading question on redirect that implied that Mr. Ken had identified Mr. Palmer's photograph during his pretrial proffers. (Am. Mot. at 11-12, 14-15).

"[A] § 2255 motion is not a substitute for a direct appeal." Harrington v. United States, 689 F.3d 124, 129 (2d Cir. 2012). Therefore, claims that have not been properly raised on appeal -- other than claims for ineffective assistance of counsel -- are procedurally defaulted and cannot be raised on collateral review without a showing of "(1) good cause to excuse the default and ensuing prejudice or (2) actual innocence."  Id.

Mr. Palmer did not raise this claim in his direct appeal (Opening Brief and Appendix on Behalf of Appellant Dwayne Palmer at 1-2, United States v. Brown, Nos. 08-4882-cr; 08-4889-cr (2d Cir.

March 23, 2009); Appellant's Pro Se Supplemental Brief ("App. <u>Pro Se</u> Br.") at v, <u>United States v. Brown</u>, Nos. 08-4882-cr; 08-4889-cr (2d Cir. Aug. 21, 2009)),[11] and he has not attempted to excuse this default.  Indeed, it is clear that the facts upon which he relies were available to him prior to the appeal, as the underlying documents were produced by the Government prior to trial pursuant to 18 U.S.C. § 3500.  (Resp. Br. at 42 & n.13; Am. Mot., Exhs. 12-13, 16-20).  Because he cannot show cause for why this issue was not presented in his appeal, there is no need to determine whether Mr. Palmer can show prejudice.

2.   <u>Actual Innocence</u>

Mr. Palmer does, however, claim that he is actually innocent of the conspiracy and murder counts.  As noted above, a showing of actual innocence can excuse procedural default.  "'[A]ctual innocence' means factual innocence, not mere legal insufficiency." <u>Bousley v. United States</u>, 523 U.S. 614, 623 (1998).  That is, the petitioner must show that, "in light of new evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'"  <u>See House v. Bell</u>,

---

[11] Although the statement of facts in Mr. Palmer's <u>pro se</u> appellate brief claims that Mr. Ken lied under oath (App. <u>Pro Se</u> Br. at viii), nowhere in the document does Mr. Palmer claim that the Government knew of the alleged perjury or argue that the allegedly perjured testimony was a grounds for reversal.  <u>See, e.g.</u>, <u>United States v. Cromitie</u>, 727 F.3d 194, 221 (2d Cir. 2013) ("[A] conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." (internal quotation marks omitted) (alteration in original)).  Thus, the claim was not raised on appeal.

547 U.S. 518, 536-37 (2006) (quoting Schlup v. Delo, 513 U.S. 298, 327 (1995)).  "To be credible, such a claim requires petitioner to support his allegations of [actual innocence] with new reliable evidence -- whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence -- that was not presented at trial."  Schlup, 513 U.S. at 324.  This burden will be met only "rare[ly,] . . . in the extraordinary case."  Id. at 321.

Mr. Palmer appears to assert a "freestanding" claim of innocence, that is, a claim that he is entitled to habeas relief because he is innocent of two of the counts for which he was convicted.  But the Supreme Court has not determined that such a claim can be the basis for issuance of the writ.  See House, 547 U.S. at 554-55 (declining to decide question); Herrera v. Collins, 506 U.S. 390, 417 (1993) (assuming without deciding that "a truly persuasive demonstration of 'actual innocence' made after trial" in a capital case would warrant federal habeas relief); Donato v. United States, No. 06 CV 5287, 2014 WL 917260, at *3 (E.D.N.Y. March 10, 2014) ("Courts have made clear that actual innocence is not an independent basis for habeas relief."); Rosario v. Ercole, 582 F. Supp. 2d 541, 559 (S.D.N.Y. 2008) ("Neither the Supreme Court nor the Second Circuit has recognized a freestanding claim of actual innocence as a basis for habeas relief."), aff'd 601 F.3d 118 (2d Cir. 2010).  What is clear is that the burden to establish entitlement to the writ based on such a claim would be "extraordinarily high" -- higher than the burden sufficient to

overcome a procedural default.  See House, 547 U.S. at 555 (stating that hypothetical freestanding actual innocence claim would "require[] more convincing proof of innocence than Schlup").

Mr. Palmer supports this claim with four affidavits:

(1)  Shawn Peterkin states that his relationship with Mr. Palmer did not have any connection to illegal activity; that the robbery of Mr. Peterkin's home netted only currency and no drugs; that no phone calls between Mr. Peterkin and Mr. Palmer discussed the robbery or drugs; that Mr. Palmer was not present at the National Black Theater shooting; that there was no meeting discussing any feud after the National Black Theater shooting; that Mr. Palmer never lived in the stash house; that Mr. Ken was the only shooter in the April 15 incident; and that shots fired in the April 16 incident were fired at Mr. Peterkin's car.  (Affidavit of Shawn Peterkin dated Nov. 18, 2011 ("Peterkin Aff."), attached as Exh. 22 to Am. Mot.);

(2)  Luna Powell, who called 911 regarding the National Black Theater shooting, states that Mr. Palmer was not present at that incident.  (Affidavit of Luna Powell dated Nov. 8, 2011 ("Powell Aff."), attached as Exh. 23 to Am. Mot.);

(3)  Judyane Douglas, who was in a relationship with Mr. Palmer at the time of the National Black Theater incident and is the mother of some of Mr. Palmer's children ((Affidavit of Dwayne Palmer dated Dec. 26, 2011 ("Palmer Aff."), attached as Exh. 25 to Am. Mot., ¶ 12), states that Mr. Palmer was with her in Albany, New York, on April 4, 2005, the day of the National Black Theater shooting.  (Affidavit of Judyane Douglas dated Sept. 29, 2011 ("Douglas Aff."), attached as Exh. 24 to Am. Mot.);

(4)  Mr. Palmer states, among other things,[12] that his relationship with his co-defendants had nothing to do with illegal activity; that he had no knowledge of the robbery of Mr. Peterkin's house or of any

---

[12] The other assertions repeat claims about counsel's failure to investigate and Mr. Ken's alleged perjury, including claims about Special Agent Baldus' grand jury testimony and Mr. Ken's pretrial proffers, noted above.  (Palmer Aff., ¶¶ 18-19, 22, 24-25).  These do not further Mr. Palmer's claim of actual innocence.

illicit activity involving Mr. Peterkin or the
other co-defendants; that Mr. Ken did not know Mr.
Palmer until after Mr. Palmer's arrest and has no
knowledge of any illegal activity engaged in by Mr.
Palmer; that Mr. Palmer was not present at the
National Black Theater incident; and that he did
not live at the stash house and was not involved in
any shooting to defend it. (Palmer Aff.).

In addition, the newly-submitted affidavits of Mr. Vassel and Mr.
Usher can be taken into account.

These affidavits are not sufficient to shoulder the Schlup
burden. And because Mr. Palmer cannot meet that standard, it is
unnecessary to address the question the Supreme Court has twice
refused to answer regarding whether federal habeas relief is ever
available for a claim of actual innocence. House, 554 U.S. at 554-
55; Herrera, 506 U.S. at 417.

First, most of the evidence presented is not sufficiently
reliable. It consists of bare affidavits with no supporting proof,
documentary or otherwise. See Hayes, 403 F.3d at 938 (suggesting
that to meet the Schlup standard in most cases, "a prisoner must
have documentary, biological (DNA), or other powerful evidence:
perhaps some non-relative who placed him out of the city, with
credit card slips, photographs, and phone logs to back up the
claim."); cf. id. at 940 (Flaum, C.J. concurring) ("Although
documentary or biological evidence may carry more weight in some
cases, a petitioner's burden may be satisfied with other types of
evidence as well."). And, with the possible exception of Mr.
Vassel and Mr. Usher, none of the affiants here can be called
disinterested. Mr. Peterkin is one of Mr. Palmer's convicted co-
conspirators, whose affidavit was executed after he was sentenced

24

and his conviction was affirmed. He therefore had "nothing to lose" by swearing to facts allegedly exculpating Mr. Palmer, even if they are harmful to himself. <u>Givens v. Kelly</u>, Civil Action No. 12-365, 2013 WL 1136739, at *8 (W.D. Pa. March 18, 2013) ("[T]he fact that this [allegedly exonerating] statement was given by a convicted co-defendant in this crime who only made the statement after he had been sentenced for his participation and therefore had nothing to lose by attempting to aid the cause of his co-conspirator raises a significant question as to its reliability." (internal quotation marks omitted)); <u>see also</u> <u>Crawford v. Grounds</u>, No. CV 11-0993, 2013 WL 812108, at *8 (C.D. Cal. Jan. 15, 2013) (rejecting declarations of co-conspirator recanting trial testimony inculpating petitioner made six months, eleven months, and thirteen years after conviction where declarant had "very little to lose" in making declaration and provided no satisfactory explanation for delay); <u>Wallace v. Chase</u>, No. CV 506-089, 2007 WL 2049585, at *3 (S.D. Ga. July 11, 2007) ("[S]uspicion [regarding the reliability of an exculpatory affidavit produced at the 11th hour] is heightened where, as here, the affidavit is from not only a convicted felon, but a man convicted of having been a co-conspirator in the same murder as [petitioner] himself."). Indeed, Mr. Peterkin's affidavit actually admits nothing: to the extent that it is exculpatory, it also exculpates him. For example, Mr. Peterkin denies that any drugs or drug money was stolen in the robbery of his house, thus attempting to undermine the prosecution's theory that the murder was in furtherance of a drug

25

conspiracy, and he implies that any firearms used on April 15 and 16, 2005, were used to shoot at Mr. Peterkin and his cohorts, rather than by them.  (Peterkin Aff., ¶¶ 2-4, 11, 14).  Moreover, the affidavit is devoid of supporting detail.  For example, in attempting to explain away the phone call to Mr. Palmer after the robbery of Mr. Peterkin's house, Mr. Peterkin asserts that its purpose was to "g[i]ve [Mr.] Palmer the weekend off [from working at Mr. Peterkin's nightclub] for undisclosed reasons."  (Peterkin Aff., ¶ 5).  There is no explanation of what those reasons were or why they remain undisclosed.  Thus, "it is clear that th[is] affidavit [is] simply unreliable as evidence of actual innocence considering the source, the timing, and the substance of the evidence."  Wallace, 2007 WL 2049585, at *3 (rejecting affidavit where co-conspirator failed to accept responsibility for murder himself or offer explanation of allegedly exculpatory statement, except with vague claim that he knew "certain facts concerning the crime").

The affidavits of Ms. Powell and Ms. Douglas are equally suspect.  Both are personal friends of Mr. Palmer -- indeed, Ms. Douglas is the mother of some of Mr. Palmer's children.  (Powell Aff., ¶¶ 3-4; Douglas Aff., ¶¶ 3-5; Palmer Aff., ¶ 12).  As such, their credibility is properly questioned.  See Borges v. Gipson, No. CV 12-8157, 2013 WL 6240423, *9 (C.D. Cal. Dec. 2, 2013) (rejecting allegedly exculpatory evidence of petitioner's girlfriend, which "was rendered suspect not only by the delayed timing but also by the evident self[-]interest of her supposed

revelations"); <u>Garcia v. Portuondo</u>, 334 F. Supp. 2d 446, 455-56 (S.D.N.Y. 2004) (rejecting affidavits of petitioner's wife and mother-in-law because they "[o]bviously . . . have reason to lie to protect petitioner").  Ms. Powell's claim that she witnessed the National Black Theater shooting and that Mr. Palmer was not there has no indicia of reliability.  It lacks any detail regarding what she saw and fails to explain why she waited years to come forward -- especially as the affidavit admits that she learned in 2005 that Mr. Palmer was alleged to have been present at that shooting.  <u>See</u> <u>Smith v. McEwen</u>, No. CV 11-6026, 2012 WL 4107806, at *8 (C.D. Cal. July 30 2012) ("It strains credibility to believe that the declarants would have waited nearly three years after petitioner was sentenced in this matter before bringing this evidence to the attention of the Court or counsel.").  To the extent that Ms. Douglas offers an explanation for her delay -- that she informed Mr. Patel that Mr. Palmer was with her the night of the National Black Theater shooting, but that he stated it was unimportant to the case (Douglas Aff., ¶¶ 5-6) -- it is uncorroborated by anything else in the record other than Mr. Palmer's obviously self-serving affidavit.  Indeed, Mr. Patel's affidavit, which post-dates Ms. Douglas', is devoid of any such suggestion.  <u>See</u> <u>Smith</u>, 2012 WL 4107806, at *8 (rejecting similar explanation because "nothing [other than the affidavit] suggest[s] that counsel was aware of, much less rejected, a potential alibi defense.").

Substantively, none of the affidavits, not even Mr. Palmer's own, refutes that Mr. Palmer was involved in the shooting death of

Mr. Simpson.   They seem designed, rather, to cast doubt on Mr. Palmer's involvement in the drug conspiracy.  However, they do not, singly or in the aggregate, "thoroughly undermine[] the evidence supporting the jury's verdict" as to the conspiracy, as is required if a claim of actual innocence is to succeed.  Rivas v. Fischer, 687 F.3d 514, 543 (2d Cir. 2012) (citing House, 547 U.S. at 553-54).   The affidavits of Ms. Powell and Ms. Douglas relate only to the National Black Theater shooting, an incident for which the evidence of Mr. Palmer's presence was already much weaker than the evidence for his participation in the April 15 stash house shooting and the subsequent killing of Mr. Simpson.[13]  As such, these affidavits do little to undermine the evidence against Mr. Palmer.

Mr. Peterkin asserts that Mr. Palmer did not live at the stash house and "did not fire any shots from any weapon" during the April 15 incident.  (Peterkin Aff., ¶¶ 10-11).  However, this neither contradicts nor subverts Mr. Ken's testimony that Mr. Palmer was involved in the incident and attempted to, but did not succeed in, firing a weapon.  Nor does Mr. Peterkin deny that Mr. Palmer was present and involved in the shooting of Mr. Simpson -- he merely asserts that unidentified "others" were shot at in his car on April

---

[13] Mr. Palmer contends that "the Court relied heavily upon the testimony of Omar Ken to place [the petitioner] at the National Black Theater." (Palmer Aff., ¶ 15).  This is neither accurate nor relevant.  In ruling on Mr. Palmer's renewed motion for acquittal at the sentencing hearing, the Court noted that Mr. Ken had asserted that Mr. Palmer was present at the National Black Theater, but then noted that this evidence was "ambiguous." (Sent. Tr. at 5).  Moreover, the court's discussion of evidence in response to a motion for acquittal for insufficient evidence is not germane to the question of whether the petitioner is actually innocent of the crimes for which he was convicted.  Bousley, 523 U.S. at 623-24.

16, 2005, but does not explicitly deny that fire was returned or
that a car chase ensued.  (Peterkin Aff., ¶ 14).  To be sure, Mr.
Peterkin insists that all of his phone communications with Mr.
Palmer were "licit" and that Mr. Palmer knew nothing about the
robbery of Mr. Peterkin's home, which could blunt the effect of
evidence that Mr. Palmer knowingly joined the marijuana conspiracy.
(Peterkin Aff., ¶¶ 5-7).  However, in light of the evidence
presented at trial -- including testimony from Mr. Ken regarding a
robbery of drugs and cash from Mr. Peterkin's home and identifying
Mr. Palmer as an active participant in the stash house shooting as
well as the shooting and car chase that culminated in the killing
of Mr. Simpson; law enforcement testimony concerning the
circumstances of Mr. Palmer's arrest with accused co-conspirators
Mr. Peterkin and Mr. Golding; forensic evidence linking the gun
found in Mr. Palmer's motel room with spent ammunition from the
scene of that shooting; and evidence that Mr. Palmer and Mr.
Peterkin were in close contact during the period at issue --
exculpatory testimony from a co-conspirator (or from Mr. Palmer,
himself) is insufficient to make it "more likely than not that no
reasonable juror would have found [the] petitioner guilty beyond a
reasonable doubt."  <u>Schlup</u>, 513 U.S. at 327.

    Nor do the newly submitted affidavits of Mr. Vassel and Mr.
Usher change this conclusion.  As noted above, each asserts that
(1) Mr. Palmer did not live in the stash house and (2) the affiant
had not seen Mr. Palmer near the address.  (Vassel Aff., ¶ 4; Usher
Aff., ¶ 4).  However, both admit that they were not witnesses to

the April 15 shooting.  (Vassel Aff., ¶ 5; Usher Aff., ¶ 5).  Mr. Ken's eyewitness account places Mr. Palmer squarely in front of the stash house with Mr. Peterkin and Mr. Golding on that night, attempting to shoot a gun.  As with the other proffered testimony, Mr. Vassel's and Mr. Usher's affidavits, if true, merely nibble at the edges of the evidence against Mr. Palmer.

The affidavits fall far short of the kind of evidence required to make out a claim of actual innocence sufficient to excuse a procedural default.  See, e.g., Stidham v. Cate, No. CV 10-0120, 2010 WL 5463795, at *5-8 (C.D. Cal. Oct. 28, 2010) (examining evidence found sufficient to satisfy Schlup standard in cases from U.S. Supreme Court, courts of appeals, and district courts, and stating, "[I]n the few cases . . . in which a federal habeas petitioner has been able to meet the [] standard, the 'new evidence' consisted of credible evidence that the petitioner had a solid alibi for the time of the crime, numerous exonerating eyewitness accounts of the crime, DNA evidence excluding the petitioner and identifying another potential perpetrator, a credible confession by a likely suspect explaining that he had framed the petitioner, and/or evidence contradicting the very premise of the prosecutor's case against the petitioner.").  Moreover, he has not shown that there is "substantial support" for his claim of actual innocence entitling him to an evidentiary hearing.  Diaz v. Bellnier, __ F. Supp. 2d __, __, 2013 WL 5454205, at *3 (E.D.N.Y. 2013).  This evidence from interested parties is simply insufficient.  See, e.g., Hayes, 403 F.3d at 937-38

(affirming denial of actual innocence claim without evidentiary hearing where new evidence consisted of alibi testimony of six family members); <u>Stidham</u>, 2010 WL 5463795, at *8-9 (denying request for evidentiary hearing where evidence of actual innocence came from interested parties).

<u>Conclusion</u>

For these reasons, I recommend denying Mr. Palmer's motion. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(d) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation.  Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Jed S. Rakoff, Room 1340, and to the chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007.  Failure to file timely objections will preclude appellate review.

Respectfully submitted,

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated:    New York, New York
          March 28, 2014

Copies mailed this date:

Bruce K. Kaye, Esq.
Barasch McGarry Salzman Penson & Lim
11 Park Place #1801
New York, NY 10007

31

Dwayne Palmer
576-98-054
FCI Berlin
P.O. Box 9000
Berlin, New Hampshire 03570

Jessica A. Masella, Esq.
Assistant United States Attorney
One Street Andrew's Plaza
New York, NY 10007